FILED

2019 Mar-27  AM 08:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

|  |  |  |
|---|---|---|
| ALEXANDRIA KELLEY, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   5:17-cv-01239-HNJ |
| | ) | |
| DECATUR BAPTIST CHURCH, | ) | |
| | ) | |
| Defendant | ) | |

**MEMORANDUM OPINION AND DISMISSAL ORDER**

Defendant Decatur Baptist Church ("Decatur Baptist") terminated Plaintiff Alexandria Kelley's employment after she informed her supervisor about her pregnancy. Decatur Baptist argues that it discharged Kelley because she violated certain religious doctrines, and sowed discord among her coworkers. Kelley contends Decatur Baptist discharged her because of her pregnancy.

This civil action proceeds before the court on Decatur Baptist's Renewed Motion to Dismiss, or in the Alternative, Motion for Summary Judgment, regarding Kelley's pregnancy discrimination claim. (Doc. 34).  Decatur Baptist argues the ecclesiastical abstention doctrine bars Kelley's claims, and thus, the court lacks subject matter jurisdiction to proceed on the merits of this action.[1]

Although Kelley faults Decatur Baptist for wrongfully terminating her

---

[1]  Decatur Baptist argues alternatively that Kelley fails to sustain her pregnancy discrimination claim on the merits, and further, the ministerial exception prohibits the court from considering Kelley's claim.

employment, the ecclesiastical abstention doctrine bars this court from adjudicating the church's decision. Therefore, based upon the following discussion, the court **GRANTS** Decatur Baptist's motion to dismiss, **DENIES AS MOOT** Decatur Baptist's motion for summary judgment, and **DISMISSES WITH PREJUDICE** Kelley's claims.

## STANDARD OF REVIEW

*Motion to Dismiss for Lack of Subject Matter Jurisdiction*

"Federal courts are courts of limited jurisdiction" and, as such, possess the power to hear cases only as authorized by the Constitution or United States' laws. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "[B]ecause a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case." *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

Federal Rule of Civil Procedure 12(b)(1) permits a district court to dismiss a case for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Plaintiff bears the burden of persuasion on establishing the court's subject matter jurisdiction. *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002)(citing *Thomson v. Gaskill*, 315 U.S. 442, 446 (1942)).

The Eleventh Circuit establishes particular modes of review for Rule 12(b)(1) challenges to subject matter jurisdiction:

[A] motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) can be based upon either a facial or factual challenge to the complaint. If the challenge is facial, the plaintiff is left with safeguards similar to those retained when a Rule 12(b)(6) motion to dismiss for failure to state a claim is raised . . . Accordingly, the court must consider the allegations in the plaintiff's complaint as true . . . A facial attack on the complaint requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion . . .

Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits are considered. Furthermore, . . . the district court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

*McElmurray v. Consol. Gov't of Augusta-Richmond Cty.*, 501 F.3d 1244, 1251 (11th Cir. 2007)(citing, *inter alia*, *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981); *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990)) (internal quotation marks and alterations omitted).

Therefore, a factual challenge to subject matter jurisdiction typically permits a "trial court . . . to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Williamson*, 645 F.2d at 412-13. No presumptive truthfulness would attach to a plaintiff's claims, and "the existence of disputed material facts [would] not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id*; *see also Lawrence*, 919 F.2d at 1528-29.

However, a different standard arises when a defendant's factual attack on subject matter jurisdiction enmeshes an element of a plaintiff's cause of action, and thus, "the attack on jurisdiction is also an indirect attack on the merits." *Lawrence*, 919 F.2d at 1530. When "the jurisdictional basis of a claim is intertwined with the merits, the district court should apply a Rule 56 summary judgment standard when ruling on a motion to dismiss which asserts a factual attack on subject matter jurisdiction." *Lawrence*, 919 F.2d at 1530 (citing *Williamson*, 645 F.2d at 415–16).[2]

In this case, adjudicating Decatur Baptist's ecclesiastical abstention contention enmeshes the merits of Kelley's claim. Therefore, the court will apply the more restrictive, Rule 56 summary judgment standard in assessing Decatur Baptist's factual attack on subject matter jurisdiction.

*The Rule 56 Standard*

"The court shall grant summary judgment if the movant shows that there is no

---

[2] Nevertheless, the court must still adjudge the jurisdictional question before assessing the merits of the claim:

> In *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83 (1998), this Court adhered to the rule that a federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding the merits. *Steel Co.* rejected a doctrine, once approved by several Courts of Appeals, that allowed federal tribunals to pretermit jurisdictional objections "where (1) the merits question is more readily resolved, and (2) the prevailing party on the merits would be the same as the prevailing party were jurisdiction denied." . . . Recalling "a long and venerable line of our cases," . . . *Steel Co.* reiterated: "The requirement that jurisdiction be established as a threshold matter ... is 'inflexible and without exception,' " . . .; for "jurisdiction is power to declare the law," and " 'without jurisdiction the court cannot proceed at all in any cause . . . .' "

*Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999).

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. Rule 56(a).   Under Federal Rule of Civil Procedure 56(a), the moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)(citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although a court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citing 9A C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2529 (2d ed. 1995) [now 9B C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2529 (3d ed. 2018)]). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes

from disinterested witnesses.'" *Reeves*, 530 U.S. at 151. (citing 9A Wright & Miller at §

2529).

As for interested witnesses favoring the movant, typically "'the mere fact that the

witness is interested in the result of the suit is deemed sufficient to require the credibility

of [the witness's] testimony to be submitted to the jury as a question of fact.'" *Sartor v.*

*Arkansas Nat. Gas Corp.*, 321 U.S. 620, 628 (1944) (quoting *Sonnentheil v. Christian Moerlein*

*Brewing Co.*, 172 U.S. 401, 408 (1899)). Nevertheless, the court may consider the

uncontradicted and unimpeached testimony of such interested witnesses when "no

reasonable point of view" tarnishes its veracity.  *Chesapeake & O. Ry. Co. v. Martin*, 283

U.S. 209, 216 (1931); *see also Hibiscus Assocs. Ltd. v. Bd. of Trustees of Policemen & Firemen Ret.*

*Sys. of City of Detroit,* 50 F.3d 908, 921 (11th Cir. 1995) (Judgment as a matter of law is

appropriate where the uncontroverted testimony of an interested witness is inherently

plausible and corroborated by other evidence.) (citing *Brown v. Ford Motor Co.,* 479 F.2d

521, 523 (5th Cir. 1973)).   Such evidence strictly manifests as incontrovertible "by proof

or circumstances, directly or inferentially"; indeed, "it is difficult to see why, if

inaccurate, [such evidence] readily could not have been" contradicted.  *Martin*, 283 U.S.

at 216; *see also Quinn v. Sw. Wood Prod., Inc.*, 597 F.2d 1018, 1024 (5th Cir. 1979)[3] ("[I]t has

been held that such testimony [of interested witnesses], even by an employee of a party,

---

[3]  *See Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as binding precedent in
the Eleventh Circuit, all decisions of the former Fifth Circuit announced prior to October 1, 1981).

must be taken as true where it was candid, the witness was not impeached, his credibility was not questioned, and his testimony was not controverted although, if inaccurate, it could readily have been shown to be so.") (citing *Martin*, 283 U.S. 209; *Texas Co. v. Hood*, 161 F.2d 618 (5th Cir.), *cert. denied*, 332 U.S. 829 (1947)).[4]

Strong circumstantial corroboration buttresses the credence of such uncontradicted, unimpeached evidence from interested witnesses.   *See* Edward H. Cooper, *Directions for Directed Verdicts: A Compass for Federal Courts*, 55 Minn. L. Rev. 903, 944 & n. 127 (1970) (citing, *inter alia*, *Texas Co. v. Hood*, 161 F.2d 618, 620 (5th Cir.), *cert. denied*, 332 U.S. 829 (1947); *Myers v. Day & Zimmermann, Inc.*, 427 F.2d 248, 252 (5th Cir. 1970)); *cited in*, 9B C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2529 n. 13 (3d ed. 2018) ("This position [regarding the unfavorable evidence the factfinder is required to believe] is developed very persuasively in Cooper . . . .").

---

[4] *See also Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3rd Cir. 2007) ("The fact is that in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible[,] even if the testimony is that of an interested witness."); *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002) ("We do not interpret the quoted language so broadly as to require a court to ignore the uncontroverted testimony of company employees."); *Wilcox v. State Farm Mutual Automobile Insurance Co.*, 253 F.3d 1069, 1071 (8th Cir. 2001) (Even [if an employee's] affidavit [could] nominally fall within *Reeves*, "where [the plaintiff] was given a clear opportunity to contradict [the defense] affidavit but did not, it would not be obvious error to include the affidavit's contents in the factual mix relevant to summary judgment.").

BACKGROUND

The undersigned sets forth the following facts in the light most favorable to Kelley pursuant to the foregoing standard.

**Decatur Baptist's Policies**

Pursuant to its Constitution and Bylaws, Decatur Baptist believes that the Bible serves as the divinely inspired and preserved Word of God. (Doc. 23 at 34). The parties believe the Bible clearly condemns unmarried, sexual intercourse. (Doc. 34 at 20; Kelley Dep. at 92).

In addition to its Constitution and Bylaws, Decatur Baptist created a Policy Manual for its employees "as a guide and reference for members of leadership at all levels of supervisory responsibility." (Doc. 36 at 31). Decatur Baptist's Policy Manual includes an Equal Employment section that provides:

> No person shall be discriminated against in employment because of such individual's race, color, sex, age, national origin, veteran status, physical or mental handicap. However, due to the Lord's stringent commands in the New Testament concerning the local church, employees and applicants would be required to adhere to the Creeds, Constitution, and Biblical standards of Decatur Baptist Church.

(Doc. 36 at 35).

Regarding terminations, the Policy Manual states that "[r]equests for terminating an employment must have approval from the Pastor and/or Deacon Board of Decatur Baptist Church." (Doc. 36 at 38). The Policy Manual also details the following

procedure for involuntary terminations of employment:

### Unsatisfactory Performance

The discharge of an employee must be accompanied by evidence of unsatisfactory performance, misconduct, disciplinary actions, or no longer a willingness to adhere to the Biblical standards of the Decatur Baptist Church.

Administrator or supervisor must have indicated any previous corrective action, such as counseling and/or reprimands, as well as documented reasons for requesting termination of the employee.

(Doc. 36 at 39).

When an employee's violation of church standards or rules warrants disciplinary action, the Policy Manual provides the Administrator should schedule a conference with the employee and advise him or her of the violation. (Doc. 36 at 57). Furthermore, if the employee continues to violate church standards or rules and the Administrator has followed the procedures, then he or she may recommend the employee's dismissal. (Doc. 36 at 58). The Policy Manual requires that whenever a supervisor considers a dismissal, he or she "must thoroughly investigate a violation and document all related facts." *Id.* Nevertheless, if an administrative investigation reveals that an employee patently disregarded the church's moral principles, "then he/she is subject to immediate dismissal without access to Employment Problem and Complaint Procedures." *Id.*

As part of its church structure, Decatur Baptist operates a daycare and preschool. (Holmes Dep. at 21:19-22:12). Danny Holmes, Decatur Baptist's children's minister,

declares that the daycare ministry serves "as a direct extension of its religious mission" because "The Bible instructs: 'Train up a child in the way he should go: and when he is old, he will not depart from it.' Proverbs 22:6." (Doc. 34 at 20, ¶¶ 2-3).

Pursuant to Decatur Baptist's bylaws, the daycare maintains its own Staff Handbook, which proclaims:

> We are a Christian child care and we are representing our Lord and Savior. We must do everything with excellence. The children we care for and their parents must come first. When the children and parents that we serve see our commitment to the place of service to which the Lord has called us, then we will be the avenue of outreach we are striving for.

(Doc. 36 at 152).

Furthermore, Decatur Baptist requires daycare employee applicants to sign a "Suggested Job Description Childcare Center Worker (Teacher)" outlining spiritual and physical qualifications, including the following:

> Each employee at Decatur Baptist Childcare Center must have received Jesus Christ as his/her personal Savior and believe that the Bible is God's word and standard for faith and daily living. The employee shall be a Christian role model in attitude, speech and actions towards others. This includes being committed to God's biblical standards for sexual conduct. (Luke 6:40) . . . He/she shall be [in] wholehearted agreement with the center's statement of faith and Christian philosophy of education. He/she shall have the spiritual maturity, academic ability and personal leadership to "train up a child in the way he should go."

(Doc. 36 at 134).

Regarding termination of Decatur Baptist daycare employees, the Staff Handbook states that "[e]mployees will be given a two-week written notice by the

10

center in case of dismissal. However, in case of failure to discharge responsibilities of the position, dismissal of a staff member may be immediate." (Doc. 36 at 158).

Mindy Monroe serves as the Director of Childcare at Decatur Baptist, and her duties include hiring daycare employees and allocating the workload among the daycare staff. (Monroe Dep. at 5:23-25 and 23:16-23; Holmes Dep. at 21:7-22 and 27:2-8). Monroe conducts the same hiring process for every position within the daycare. (Monroe Dep. at 10:24-12:25; 34:12-22).   Upon completing an application, a prospective employee interviews with Monroe and answers questions related to his or her spiritual background. (Monroe Dep. at 10:24-13:14; 15:25-206).

Monroe testified she was unfamiliar with Decatur Baptist's Policy Manual and does not review the Policy Manual with new daycare employees. (Monroe Dep. at 8:18-9:14). Neither Monroe nor Holmes discussed Decatur Baptist's Constitution and Bylaws with Kelley during her employment at the daycare. (Monroe Dep. at 32:19-33:4; Holmes Dep. at 20:18-24).

## Decatur Baptist Hires Kelley for Employment

On March 2, 2015, Kelley completed an application for a custodial position at Decatur Baptist. (Doc. 37-10 at 16-22). In her application, Kelley answered several questions regarding her personal faith experience, how her beliefs impact her work with children, and her expectations for her role. (*Id.* at 20-22). During her interview with Kelley, Monroe did not review the qualifications contained within the job description or

11

inquire as to Kelley's living situation. (Monroe Dep. at 20:17-23 and 33:5-13). Kelley remembers signing paperwork during the interview that laid out spiritual qualifications for her position, yet she does not remember reviewing the paperwork with Monroe. (Kelley Dep. at 40:1-4).

On March 18, 2015, Decatur Baptist hired Kelley as a custodial worker for the daycare center. (Kelley Dep. at 28:23-29:12). Kelley's primary duties consisted of routinely cleaning the rooms within the daycare center. (Kelley Dep. at 49:5-17). Both Holmes and Kelley testified that Kelley also interacted with children, parents, and other church members at the daycare throughout the day. (Kelley Dep. at 47-50; Holmes Dep. at 55).

## Decatur Baptist Terminates Kelley's Employment

Monroe also served as Kelley's supervisor at the daycare center. (Kelley Dep. at 73:16-19).  On August 17, 2015, Kelley informed Monroe that she was six weeks pregnant and had married her conceived offspring's father two days earlier. (Kelley Dep. at 75; Monroe Dep. at 5-6, 27-29). Monroe asked Kelley if she was living with her partner at the time she conceived, and Kelley told her she was not. (Monroe Dep. at 29).

Then, Monroe asked Kelley if she knew what the Bible stated about premarital sex. (Monroe Dep. at 29:5-12; Kelley Dep. at 75:23-77:12). Monroe then informed Kelley that "God doesn't like that." (Kelley Dep. at 76:3-7).  After that remark, Monroe informed Kelley she would have to pray about the course of action regarding

12

Kelley's employment, and would need to speak with Holmes about Kelley's pregnancy. (Kelley Dep. at 76:3-7; Monroe Dep. at 29:5-12). Kelley felt Monroe was judging her "like she had never been judged before." (Kelley Dep. at 78:4-5). Monroe attested Kelley was fearful because she inquired whether the pregnancy would impact her job. (Monroe Dep. at 30:8-12).

Over the next ten days, Kelley informed several coworkers she was pregnant. (Kelley Dep. at 81:6-10). Other staff members informed Monroe that Kelley confided she was living with her partner at the time she conceived. (Monroe Dep. at 63). One of the staff members informed Monroe that Kelley had also confided that she and her partner lived together for six years prior to their marriage. (Monroe Dep. at 65). Kelley did not speak with any leadership at Decatur Baptist following her initial meeting with Monroe until Holmes and Monroe met with her approximately ten days afterward. (Kelley Dep. at 85:14-21).

After Monroe informed Holmes about Kelley's pregnancy, Holmes also discovered, based upon people who discussed the matter with Kelley, she had been living with her partner. (Holmes Dep. at 43:15-44:5).[5]  Thereafter, Holmes decided to terminate Kelley's employment, (Holmes Dep. at 51-53), and he shared his decision with Pastor Doug Ripley, Decatur Baptist's senior pastor. (Ripley Dep. at 13:2-5).

---

[5] Holmes admits that he did not ask Kelley whether: (1) she was living with her partner at the time of her application; (2) what her church status was; (3) how the child was conceived; and (4) whether Kelley lived with her partner. (Holmes Dep. at 48:7-25).

13

Holmes informed Ripley a daycare employee had practiced immorality and was sowing discord among her coworkers, and therefore he was terminating her employment. (Ripley Dep. at 13:2-5).

On August 27, 2015, Holmes and Monroe met with Kelley. (Kelley Dep. at 199; Monroe Dep. at 60; Holmes Dep. at 49). After Holmes and Monroe congratulated Kelley on her pregnancy, they informed her she could no longer work at Decatur Baptist's daycare due to the pregnancy. (Kelley Dep. at 86; Kelley Dep. at 198:6-9). Kelley testified it was the last thing she believed would occur when she walked into the office, and she "[h]ad never felt so exposed and judged in [her] whole life." (*Id.*) Kelley does not remember anything about the meeting with Holmes and Monroe besides Holmes's declaration that she was terminated for being pregnant. (Kelley Dep. at 199:6-13; 198:10-14).[6]

Holmes testified that he presented Kelley a document listing two reasons for her

---

[6] Kelley reiterated what she remembered during the following interaction in her deposition:

> Q: Under number 12, you say, Pastor Holmes told me unequivocally I was terminated because I was pregnant. And, again, you were light on exactly what you remembered in the meeting, and so I'm not putting pressure on you. But it was Mindy, or was it Pastor Holmes, or do you remember Pastor Holmes doing the speaking?
>
> A: It was Pastor Holmes.
>
> Q: And do you remember anything else he said besides —
>
> A: Besides what I told you, no.

(Kelley Dep. at 142:23 – 143:11).

discharge – immorality and sowing of discord. (Holmes Dep. at 57). Holmes declared he dismissed Kelley due to her cohabitation with her partner and the discord she sowed during the ten-day period the church representatives deliberated about a course of action. (Holmes Dep. at 51:10-25).

Monroe testified that during the meeting, Holmes informed Kelley she was discharged because she had violated the moral code of Biblical standards. (Monroe Dep. at 39-40). Kelley became upset, stated that other employees in the daycare lived the same way as she did, and remarked she would "take them down with her." (*Id.*)

Monroe transcribed notes about the meeting the day after, which include the following recitation:

> Alex got married on August 15th, 2015, on Monday August 17th Alex met with me and told me that she was six weeks pregnant and wanted to know if she would lose her job. I asked her if [her partner] and her had been living together and she told me no, then with a slight smile she added but you know there were times we didn't have [her daughter] with us. I then asked her if she knew what God's Word said concerning this, she replied that she did in a rather angry tone. I told her I would have to think on what I should do and that I would get back to her.

> Bro. Danny [Holmes] and I discussed this issue and felt that the right thing to do was to let Alex go. On our employment applications I ask for their personal testimony as to their salvation experience and then during the interview I ask them to tell it to me as well. Each employee signs a Spiritual and Physical Qualifications form committing to God's biblical standards for sexual conduct.

> On Thursday, August 27th Bro. Danny and I met with Alex to let her go due to her not upholding her commitment to the biblical standards. Alex became very upset and stormed out.

15

(Doc. 36 at 164).

On September 28, 2015, Kelley filed a Charge of Discrimination with the Equal Employment Opportunity Commission, alleging claims of gender and pregnancy discrimination. (Doc. 37-6 at 2). Kelley does not remember viewing a statement that she violated Biblical standards until after she filed an EEOC claim. (Kelley Dep. at 198:15-20).

To wit, on October 14, 2015, Holmes sent a letter to the EEOC seeking to further expound upon Kelley's termination. (Doc. 37-3 at 4). In his letter, he explains the daycare dismissed other female employees for failing to uphold the code of conduct in areas such as Christian attitude, speech, and actions towards others. (*Id.*) On June 16, 2016, Holmes drafted another letter to the Birmingham EEOC office, explaining that the lack of sexual purity and the division Kelley caused among the daycare workers led to the termination of her employment. (Doc. 37-3 at 5-7).

On February 10, 2017, the EEOC issued a Letter of Determination, finding that "[e]vidence showed that after Pastor Danny Holmes became aware of her pregnancy, he discharged her. Evidence showed that Respondent discharged Charging Party because of her pregnancy." (Doc. 37-3 at 2). On April 27, 2017, the EEOC issued Kelley a Notice of Right to Sue Letter, stating that "[t]he EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the

16

matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you." (Doc. 37-5 at 2).

## Decatur Baptist's History of Disciplining Daycare Employee Conduct

Monroe attests that during the sixteen years the daycare operated prior to Kelley's termination, at least twenty married employees either were pregnant when hired or became pregnant while employed, and the church did not terminate them because of their pregnancies. Kelley testified that she remained unaware of any other employees that were fired for being pregnant. (Kelley Dep. at 94:8-19). Monroe declared no unmarried, pregnant daycare employee was ever allowed to retain her job. (Monroe Dep. at 42; Doc. 34 at 53).

To the extent that it was aware, Decatur Baptist did not allow any daycare employee cohabiting with a partner of the opposite gender to continue employment. (Doc. 34 at 54). That is, Decatur Baptist terminated other unmarried, daycare employees when it discovered they were cohabiting with partners. (Monroe Dep. at 42). Decatur Baptist had also terminated two daycare employees for engaging in an inappropriate sexual conversation in the presence of children. (Monroe Dep. at 57).

Holmes recounted several employees who Decatur Baptist terminated immediately for conduct similar to Kelley's. (Holmes Dep. at 65-68). For example, Holmes testified Decatur Baptist terminated at least two unmarried, male maintenance employees for cohabiting with partners. (Holmes Depo. at 66-67). Decatur Baptist also

discharged one church employee for engaging in extramarital sex. (*Id.*)

Ripley testified that Decatur Baptist did not immediately terminate a maintenance employee who engaged in the purported immorality of alcohol use. (Riley Dep. at 15-16). Decatur Baptist conducted an investigation of the employee, which revealed a pattern of alcohol use and deception. (Ripley Dep. at 15:13-19). Ripley testified that "the straw that broke the camel's back" occurred when the employee arrived at work having consumed alcohol shortly before arrival. (Ripley Dep. at 16:2-4). After discovering the employee's alcohol use, Decatur Baptist accorded the employee counseling. (Ripley Dep. at 16-17). Decatur Baptist terminated the employee after repeated violations. (Ripley Dep. at 15-16).

## ANALYSIS

## THE ECCLESIASTICAL ABSTENTION DOCTRINE PRECLUDES SUBJECT MATTER JURISDICTION OVER KELLEY'S CLAIMS BECAUSE NO REASONABLE FACTFINDER COULD DENY DECATUR BAPTIST DISCHARGED KELLEY FOR VIOLATING THE CHURCH'S RELIGIOUS DOCTRINE

Kelley contends Decatur Baptist unlawfully terminated her because of her pregnancy in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Decatur Baptist counters that it terminated Kelley's employment because she violated its religious standards of morality, church policy, and her job description.  As the court found in ruling on Decatur Baptist's initial Motion to Dismiss, the parties present diametrically opposed rationales for the termination of Kelley's employment.

After reviewing the evidence before the court, Kelley fails to establish that a reasonable factfinder may determine Decatur Baptist fired her because of her pregnancy. Construing the facts in the light most favorable to Kelley, Decatur Baptist's contention prevails and commands application of the ecclesiastical abstention doctrine to preclude subject matter jurisdiction.

Title VII provides that "[it] shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. §2000e-2(a)(1). The Pregnancy Discrimination Act solidified the interpretation of the Title VII phrases "because of sex" and "on the basis of sex" to include "because of or on the basis of pregnancy, childbirth or related medical conditions." 42 U.S.C. § 2000e(k); *see also Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 684 (1983)("The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex.").

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. I. Among the doctrines established under the foregoing clauses' purview, the ecclesiastical abstention doctrine, also known as the church autonomy doctrine,

requires "civil courts to abstain from deciding issues connected to 'theological controversy, church discipline, ecclesiastical government, or conformity of members of the church to the standard of morals required of them.'" *Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, No. 15-13755, 2018 WL 258782, at *2 (11th Cir. Jan. 2, 2018) (quoting *Crowder v. S. Baptist Convention*, 828 F.2d 718, 722 (11th Cir. 1987)) (citing *Watson v. Jones*, 80 U.S. 13 Wall. 679, 733 (1871)); *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 723 (1976); *Simpson v. Wells Lamont Corp.*, 494 F.2d 490, 493–94 (5th Cir. 1974)). In such disputes, civil courts risk, one, abridging the free exercise of religion by affecting religious conduct, and, two, "establishing" a religion by enforcing "a particular religious faction." *Myhre*, 2018 WL 258782 at *2 (citing *Crowder*, 828 F.2d at 721).

The First Amendment does not entirely exempt decisions by religious organizations from adjudication, as civil courts "may apply neutral principles of law to decide church disputes that 'involve no consideration of doctrinal matters.'" *Myhre*, 2018 WL 258782 at *2 (quoting *Jones v. Wolf*, 443 U.S. 595 (1979)). However, when a matter does not present a proper occasion for the application of neutral principles, a "dispute involving the application of church doctrine and procedure to discipline one of its members is not appropriate for secular adjudication." *Myhre*, 2018 WL 258782 at *2 (citing *Milivojevich*, 426 U.S. at 723; *Crowder*, 828 F.2d at 726). Therefore, "civil courts may not use the guise of the 'neutral principles' approach" to determine matters of

religious doctrine, polity, governance, etc. *Crowder*, 828 F.2d at 725. These decisions "'radiate[] . . . a spirit of freedom for religious organization, an independence from secular control of manipulation – in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S. 171, 185 (2012)(quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N.A.*, 344 U.S. 94, 117 (1952)).

Most critically at this juncture, the ecclesiastical abstention doctrine incites the subject matter jurisdiction of the court to adjudicate Kelley's claim. *Myhre*, 2018 WL 258782 at *2 (citing Fed. R. Civ. P. 12(b)(1)); *see also Milivojevich*, 426 U.S. at 713-14 ("'civil courts exercise no jurisdiction'" "'where a subject-matter of dispute'" "'concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them'") (quoting *Watson*, 13 Wall. at 733-734).

With the advent of this background, the intertwinement of the facts regarding the jurisdictional question and the merits of Kelley's claim manifests.   Kelley contends Decatur Baptist discharged her because of her pregnancy. Decatur Baptist contends Kelley's termination stems from her violation of Decatur Baptist's moral conventions, which incites the ecclesiastical abstention doctrine.   The facts regarding the ecclesiastical abstention determination comprise the same facts governing the Title VII

21

pregnancy discrimination claim.

Therefore, as reviewed earlier, the court's authority to exercise subject matter jurisdiction over Kelley's claims turns on whether there exists any evidence in the record – taken in the light most favorable to Kelley and according due regard for any genuine issue of material fact – that would enable a reasonable factfinder to determine Decatur Baptist discharged Kelley because of her pregnancy rather than its religious doctrines.   Based on the following analysis, there exists no such evidence.

The event at the crux of Kelley's claims constitutes her meeting with Holmes and Monroe.   According to Kelley, Holmes declared that Decatur Baptist was discharging her because of her pregnancy.   If this evidence comprised the only factual account of the meeting, then Kelley would prevail at this stage of the case.

However, Holmes and Monroe chronicled additional facts occurring during the meeting that portray the reasons for the discharge. As depicted in the Background, there exists uncontradicted and unimpeached evidence that Holmes informed Kelley the church was discharging her because she violated religious doctrines regarding sexual conduct and cohabitation outside of marriage.   This evidence rebuts Kelley's recitation that Holmes terminated her merely due to her pregnancy.   As it contends, Decatur Baptist discharged Kelley because she conceived while unmarried and cohabiting with her partner, which violated its religious doctrines.   *See Boyd v. Harding Academy of Memphis, Inc.*, 88 F.3d 410, 414 (6th Cir. 1996)(when defendant Christian school

22

informed plaintiff that it was discharging her for being "pregnant and unwed," it meant "had engaged in sex outside of marriage").

Although Holmes's and Monroe's uncontradicted and unimpeached testimony about the meeting emanate from interested witnesses, as reviewed previously the court may give credence to the testimony because Kelley did not controvert it when she could have easily done so by testifying their version of the meeting did not occur.   Kelley did not contradict or impeach the testimony, and her failure to remember any facts that transpired after Holmes's pregnancy utterance — or that she does not remember viewing a statement that she violated biblical standards until after she filed an EEOC claim — does not represent contradiction or impeachment.   *See Torjagbo v. United States*, 285 F. App'x 615, 619 (11th Cir. 2008) (plaintiff's failure to remember signing a covenant not to sue did not raise a genuine issue of fact as to the authenticity of his signature); *Chandler v. James,* 985 F. Supp. 1094, 1100 (M.D. Ala. 1997) ("[A] witness who states that he cannot remember whether or not an event alleged to have happened by the moving party actually took place does not help the nonmoving party to meet its burden. The nonmoving party must come up with evidence that negates the version of events alleged by the moving party -- an acknowledgment that the event may have occurred, but the witness cannot remember, falls short."); *Wells v. CRST Malone, Inc.*, No. 2:15-CV-01884-RDP, 2017 WL 6619153, at *3 (N.D. Ala. Dec. 28, 2017) ("[A] witness's inability to remember an event, standing alone, generally does not create a

genuine issue of fact for summary judgment purposes.") (citing *Linao v. GCR Tire Ctrs.*, 2010 WL 4683508, at *5 (N.D. Ga. Nov. 12, 2010); *Chandler*, 985 F. Supp. at 1100 (M.D. Ala. 1997)); *Maiten v. Tucker*, No. CIV.A. 11-0305-WS-B, 2014 WL 1017876, at *2 (S.D. Ala. Mar. 17, 2014) ("The Court is only to 'make all reasonable inferences in favor of the party opposing summary judgment ... not to make all *possible* inferences in the nonmoving party's favor.'") (citation omitted, emphasis in original).

Furthermore, Decatur Baptist tendered strong circumstantial corroboration of Holmes's and Monroe's account that they informed Kelley she was discharged for cohabiting and conceiving out of wedlock in violation of their religious doctrines. Upon Kelley first informing Monroe of the pregnancy, Monroe queried Kelley about the Bible's tenets regarding premarital sex, and Monroe contemporaneously remarked, "God doesn't like that."  Based upon this discussion, Kelley felt Monroe was judging her "like she had never been judged before."  (Kelley Dep. at 78:4-5).  Monroe's remark and Kelley's admission serves as a strong indication that religious doctrine underlies Decatur Baptist's justification for Kelley's discharge, and Kelley felt the church's moral judgment therewith.

Moreover, Kelley admitted that after Holmes informed her she was discharged, she "[h]ad never felt so exposed and judged in [her] whole life."  (Kelley Dep. at 86). Again, Kelley's experience of moral condemnation during the meeting corresponds to a

discharge for violation of Decatur Baptist's religious doctrines, not to a discharge for merely being pregnant.

Monroe's near-contemporaneous account of the meeting – which she recorded before Kelley filed an EEOC charge – also buttresses the finding that Holmes informed Kelley she was discharged for violations of religious doctrine. Monroe wrote that Decatur Baptist discharged Kelley for "not upholding her commitment to the biblical standards," which caused Kelley to become "very upset and storm[ ] out" of the meeting. (Doc. 36 at 164).

Finally, strong corroboration results from Decatur Baptist's other evidence regarding pregnant employees and employees who cohabitated while unmarried. First, Decatur Baptist employed other women who were pregnant, and it did not discharge those women upon being apprised of their pregnancies. Second, Decatur Baptist discharged other unmarried, daycare employees when it discovered they were cohabiting with their partners. Third, Decatur Baptist discharged other church employees for cohabiting with their partners while unmarried, including two male maintenance employees. This evidence strongly corroborates the testimony by Decatur Baptist's representatives that they discharged Kelley for conceiving and cohabiting while unmarried, and that they informed her so during the meeting announcing the discharge.

To rebut Decatur Baptist's evidence, Kelley asserts that Decatur Baptist's

25

allegedly inconsistent rationales for discharging her indicates that her pregnancy caused her termination. Kelley refers to the following rationales by Decatur Baptist's representatives:

- On August 28, 2015, Monroe stated in her typed notes the day after the meeting that Holmes terminated Kelley for failing to uphold her commitment to "God's biblical standards for sexual conduct". (Doc. 36 at 164).
- On June 16, 2016, in his letter to the EEOC, Holmes indicated that he terminated Kelley for a "lack of sexual purity and the division that she caused among the day care women." (Doc. 37-3 at 5-7).
- On June 11, 2018, Holmes testified in his deposition that he terminated Kelley "because of the immorality that she had with her live in boyfriend some six years and the discord that she caused." (Holmes Dep. at 51:10-25).

(Doc. 37 at 20). Kelley argues that these purported, inconsistent statements demonstrate Decatur Baptist did not consistently rely upon the same rationale to justify her termination.

To the contrary, there exists no appreciable distinction between the phrases, "God's biblical standards for sexual conduct," "lack of sexual purity," and "immorality that she had with her live in boyfriend."   All of these justifications reflect synonymous rationales:   Decatur Baptist discharged Kelley for violating its religious proscriptions against unmarried sex and cohabitation.

In further objection, Kelley contends that the first time she understood Decatur Baptist terminated her for violating its morality standards occurred after she filed a charge with the EEOC. (Kelley Dep. at 198:10-199:2). Crucially, Kelley remembers

feeling judged during the meeting, which buttresses Decatur Baptist's contention that it informed her of the religious morals basis for the discharge during the meeting. Furthermore, Kelley admits she does not remember anything about the meeting after Holmes remarked she was discharged because of her pregnancy. As reviewed previously, Kelley's lack of memory about Holmes's morality rationale expressed during the meeting does not suffice to contradict Decatur Baptist's depiction. Understandably, Kelley experienced emotional distress upon hearing Decatur Baptist discharged her, yet such distress does not mar the uncontroverted evidence of the events that transpired during the meeting.

Kelley further alleges that Decatur Baptist treated her differently from other employees who violated the church's morality standards. In particular, a male maintenance worker violated Decatur Baptist's standards by engaging in purported immorality via alcohol use, yet he received counseling on the church's faith and practices standards and undertook opportunities to correct his behavior before Decatur Baptist terminated his employment. (Ripley Dep. at 13:24-17:19).

However, as recounted in the Background, Decatur Baptist terminated the employees – male and female, pregnant and non-pregnant –it believes engaged in sexual misconduct. Decatur Baptist also employed married employees who were pregnant, and it did not terminate any of them because of the pregnancies. *See Boyd*, 88 F.3d at 414-15 (based upon evidence the defendant consistently discharged both male and female

27

employees who engaged in sex outside of marriage, whether or not pregnancy resulted from the conduct, plaintiff failed to demonstrate that defendant's proffered nondiscriminatory reasons for plaintiff's termination was mere pretext for gender discrimination).

The foregoing diverging disciplinary events portray Decatur Baptist's distinction among behaviors it deems immoral, not evidence of impermissible gender discrimination based upon pregnancy.  To assess such distinctions, the court would have to scrutinize documents related to religious doctrine, and apply its interpretation of such doctrine to conduct at Decatur Baptist. *See Myhre v. Seventh-Day Adventist Church Reform Movement Am. Union Int'l Missionary Soc'y*, No. 1:14-cv-03899-SCJ, 2015 WL 13687326, at *5 (N.D. Ga. July 24, 2015)("In other words, the Court would have to determine whether Defendants exercised their religion in accordance with their doctrine, faith, custom, and rules of governance.").  As described, any further parsing of the distinctions represents an improper intrusion upon Decatur Baptist's right to interpret its religious doctrine.

Kelley also discredits Decatur Baptist's rationale for her discharge because she was not in violation of the church's morality standards at the time of her termination as she had married her partner. (Kelley Dep. at 10:19-23). However, Holmes discharged Kelley for violating Decatur Baptist's religious doctrine, and "the duration or continuing nature of the violation [makes] no difference." *Boyd*, 88 F.3d at 414.    That

28

is, Decatur Baptist deemed Kelley's supposed transgressions irremediable by her amelioration.  As just expressed, the court cannot invade upon Decatur Baptist's autonomy in this regard.

Finally, Kelley alleges Decatur Baptist never showed her its Constitution and Bylaws or advised her of the church's Articles of Faith. (Monroe Dep. at 32:19-33:4; Kelley Dep. at 61:12-65:14). As reflected in the Background, Kelley signed a document during the application process reflecting Decatur Baptist's spiritual requirements for employment. Moreover, even if Kelley did not view any documents reflecting religious tenets prior to her discharge, one fails to discern how such circumstances preclude a religious establishment from relying upon its tenets to govern its internal affairs. Surely, an established religious entity's failure to promulgate religious doctrine in this regard cannot abridge the constitutional right to religious autonomy.

## CONCLUSION

Decatur Baptist determined that Kelley violated its morality standards as detailed in its Constitution and Bylaws, as well as the daycare's staff handbook, and terminated her employment as a result of that determination. Under the First Amendment, regardless of the views about the propriety of such a determination, the court must not invade Decatur Baptist's right to reach its decision in this manner.

Therefore, based upon the foregoing analyses, the court **GRANTS** Decatur Baptist's motion to dismiss, **DENIES AS MOOT** Decatur Baptist's motion for

summary judgment, and **DISMISSES WITH PREJUDICE** Kelley's claims. The court will enter a separate order in conformity with the Memorandum Opinion.

**DONE** this 27th day of March, 2019.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE